# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| R.J. Zayed, in his Capacity as Court-Appointed Receiver for Oxford Global Partners, LLC, Universal Brokerage FX, and Other Receiver Entities, | Civil No. 13-CV-1896 (SRN/SER) |
| **Plaintiff,** | **MEMORANDUM OPINION AND ORDER** |
| v. | |
| David and Dao Allen, Judith Averett, Patricia and Jasper Calandra, Rose Furner, Mark Hanby, Adel ("A.K.") Hilal, Geraldine Jackman, Norma Johnson, Willis Wayne King, Don and Pamela Labbee, Andrew Lyon, Jeffrey Lyon, Jeffrey Maki, Steven Perkins, Richard Plantan, Douglas Reed, David Sherman, John Sterback, Mark Stoltenberg, Jane Wamsley as trustee for the Glen Van Lehn Living Trust, Michael ("Bruce") Wu, Robert and Dianne Birk, Margaret Anderson, Mary Francoeur, George and Shirley Janssen, Joseph Koehnen, and Katherine Sobieck, | |
| **Defendants.** | |

---

R.J. Zayed, Tara C. Norgard, Russell J. Rigby, and Brian W. Hayes, Carlson, Caspers, Vandenburgh & Lindquist, 225 S. Sixth Street, Minneapolis, Minnesota, 55402, for Petitioner

James R. Behrenbrinker, Behrenbrinker Law Firm, 412 South Fourth Street, Suite 1050, Minneapolis, Minnesota 55415, for Defendant Hilal

Mark Stoltenberg, Pro Se, 1517 West Jacinto Avenue, Mesa, Arizona 85202

Karl L. Cambronne, Chestnut Cambronne, PA, 17 Washington Avenue North, Suite 300, Minneapolis, Minnesota 55401, for Defendants Robert and Dianne Birk

_____

SUSAN RICHARD NELSON, United States District Court Judge

This matter is before the Court on the Plaintiff's Motion for Summary Judgment [Doc. No. 139] and Defendant Stoltenberg's Motion to Dismiss and Opposition to Summary Judgment [Doc. No. 157]. For the reasons set forth herein, the parties' motions are denied without prejudice.

I.   BACKGROUND

On July 15, 2013, the Receiver filed the Complaint [Doc. No. 1] in the instant suit, seeking the return of alleged receivership assets from 32 Defendants. The Receiver asserted claims of fraudulent transfer under Minn. Stat. § 513.41, et seq., and unjust enrichment. Most Defendants settled their claims with the Receiver prior to the filing of the Receiver's summary judgment motion. (See Pl.'s Status Report at 3; 5 [Doc. No. 119].) This ruling addresses the Receiver's Motion for Summary Judgment as it pertains to the four remaining Defendants: Adel ("A.K.") Hilal, Mark Stoltenberg, and Robert and Dianne Birk.[1]

_____

[1] Since the filing of the Receiver's motion, default judgment was entered against Defendant Jeffrey Maki (Default J. [Doc. No. 170]) and, pursuant to the parties' stipulation, Defendants George and Shirley Janssen were dismissed with prejudice from this action. (Order of 11/18/14 [Doc. No. 173].)

This case arises out of a $190 million Ponzi scheme operated by Trevor Cook.[2] The collapse of Cook's Ponzi scheme led to criminal prosecutions for Cook and his business colleagues, see, e.g., United States v. Cook, No. 10-CR-75 (JMR) (D. Minn.); United States v. Beckman, No. 11-CR-228 (MJD/JJK) (D. Minn.), and spawned numerous civil lawsuits, including this one.  See, e.g., Zayed v. Associated Bank, N.A., __F.3d __, 2015 WL 855707 (8th Cir. Mar. 2, 2015); Zayed v. Buysse, No. 11-CV-1042 (SRN/FLN) (D. Minn.); CFTC v. Cook, No. 09-CV-3332 (MJD/FLN) (D. Minn.); SEC v. Cook, 09-CV-3333 (MJD/FLN) (D. Minn.).  Cook operated the Ponzi scheme with his colleagues Patrick Kiley, Chris Pettengill, Gerald Durand, and Jason Bo-Alan Beckman ("Bo Beckman").  Order of 9/27/12 at 2-3, Buysse, No. 11-CV-1042, ECF. No. 260.

As this Court noted in Buysse, as of January 2007, Cook and his business colleagues solicited investors to participate in a fabricated foreign currency trading program.  Id. at 2.  Cook operated various entities in connection with his sham foreign currency program, generally identified by the terms "Oxford" and "UBS," including Oxford Global Advisors, Oxford Global Partners, LLC, the Oxford Private Client Group, LLC, UBS Diversified, UBS Global Advisors, LLC, Universal Brokerage FX (collectively, the "Oxford Entities" and the "UBS Entities"), as well as an entity known as Crown Forex.  Id. at 3.  Cook withheld from investors the fact that he diverted their funds

---

[2]   A "Ponzi Scheme" generally describes a fraudulent investment scheme in which money taken from later participants is paid to earlier participants to create the false appearance that the scheme is generating returns.  See Cunningham v. Brown, 265 U.S. 1, 7–9 (1924) (describing the schemes of Charles Ponzi).

for other purposes including: (1) making payments of interest and principal to other

investors; (2) purchasing an ownership interest in two trading firms; (3) working on real

estate development in Panama; (4) paying personal expenses; (5) acquiring his

Minneapolis headquarters, the Van Dusen Mansion; and (6) providing funds to Crown

Forex, SA in an effort to deceive Swiss banking regulators.  Id. at 5-6.  In total, over 700

people invested approximately $158 million in Cook's Ponzi scheme.  See Receiver's

Third Am. Final Claims List, SEC v. Cook, No. 09-CV-3333, ECF. No. 1110-1.

    In July 2009, Cook's scheme began to collapse as certain investors who had

requested the return of their investments filed suit when Cook failed to return their funds.

See Second Am. Compl. ¶ 54, Phillips v. Cook, No. 09-CV-1732 (MJD/FLN), ECF. No.

1.  The SEC and CFTC filed suits against Cook shortly thereafter.  See Compl., SEC v.

Cook, 09-CV-3333, ECF No. 1; Compl., CFTC v. Cook, 09-CV-3332, ECF No. 1.

    In November 2009, this Court created a receivership to preserve and apportion any

assets involved in Cook's Ponzi scheme on behalf of the victims of the fraud.  See Order

of 11/23/09 at 7, CFTC v. Cook, 09-CV-3332, ECF No. 21.  R.J. Zayed was appointed as

the Receiver and given "full power to sue" in order to perform all acts necessary to

preserve the value of the assets.  Id. at 6-7.  A primary duty of a court-appointed receiver

is to maximize distributions for the benefit of the receivership's investors and creditors.

See Scholes v. Lehmann, 56 F.3d 750, 755 (7th Cir. 1995).  On July 20, 2010, the Court

entered an Order granting the Receiver permission to commence summary proceedings,

or "clawback actions," to recover Receivership assets transferred to third parties.  Order

4

of 7/20/10, <u>SEC v. Cook</u>, 09-CV-3333, ECF No. 380; <u>see also</u> Order of 7/20/10, <u>CFTC v.</u>

<u>Cook</u>, 09-CV-3332, ECF No. 350.   Via clawback actions, "a trustee or receiver puts all

parties that transacted with the purveyor of a failed Ponzi scheme onto a parity in the

matter of restitution" and "the property that . . . remain[s] in-hand with the purveyor as of

the collapse, [is] augmented by recoveries of funds from those lenders and investors who

got out early."   <u>In re Petters Co., Inc.</u>, 440 B.R. 805, 806 (D. Minn. 2010).   The investors

who get out early are often referred to as "winning investors," if only because they

received some return on their investment, in contrast to "losing investors," who received

nothing.   <u>See</u> <u>Donell v. Kowell</u>, 533 F.3d 762, 770 (9th Cir. 2008).

　　　　After pleading guilty to his role in the fraud, Cook received a 25-year prison

sentence.   Sentencing J., <u>United States v. Cook</u>, No. 10-CR-75, ECF No. 18.   Cook's

business partner Chris Pettengill also pleaded guilty to participating in the fraud and is

serving a seven-and-a-half-year prison sentence.   Sentencing J., <u>United States v.</u>

<u>Pettengill</u>, 11-CR-192 (MJD), ECF No. 32.   A jury convicted Beckman, Kiley, and

Durand on charges of conspiracy and multiple counts of mail and wire fraud.   Jury

Verdicts, <u>United States v. Beckman</u>, 11-CR-228 (MJD/JJK), ECF Nos. 303, 305, 307.

Beckman is serving a 32-year sentence, Am. Sentencing J., <u>United States v. Beckman</u>, 11-

CR-228, ECF No. 414, and Kiley and Durand are each serving a 20-year sentence, <u>id.</u>

ECF Nos. 392 & 415.

A.      **SEC v. Beckman** Litigation

In March 2011, the SEC filed a separate suit against Beckman and his registered

investment advisory firm, the Oxford Private Client Group (the "OPCG").  SEC v.

Beckman, 11-CV-574 (MJD/FLN) (D. Minn.) (hereinafter "Beckman SEC").[3]  In the

SEC action against Beckman, the SEC alleged that he played a significant role in Cook's

foreign currency scheme, raising almost twenty-five percent of the invested funds, i.e.,

$47.3 million of the $194 million.  Compl. ¶ 3, Beckman SEC, 11-CV-574, ECF No. 1.

The SEC further alleged that through Beckman or the OPCG, investors suffered losses of

at least $39.1 million, with the remaining $8.2 million returned to investors in the form of

purported returns or interest payments.  Id. ¶ 4.  In addition, the SEC asserted that

Beckman received approximately $7.8 million from accounts containing the investors'

funds – money that he used to pay for million dollar homes, luxury cars, country club

expenses, and foreign travel.  Id. ¶ 6.  The SEC named Beckman's wife, Hollie Beckman,

as a relief defendant in the lawsuit because she was a joint account holder of several

accounts that received investors' funds.  Id. ¶ 28.  The SEC identified numerous accounts

containing investor funds to which the Beckmans maintained access from August 2006 to

the SEC's filing of its complaint in 2011.  Id. ¶ 60.  The SEC sought to freeze

Defendants' accounts, requested the appointment of a receiver, and sought to disgorge the

---

[3] Beckman was not a named defendant in the earlier SEC case, 09-CV-3333, which was filed against Cook, Kiley, and various UBS and Oxford entities.

Beckmans' gains.  Id. at p. 42; Pl.'s Mot. for Asset Freeze & Appointment of Receiver,

Beckman SEC, 11-CV-574, ECF No. 2.

The Court appointed R.J. Zayed as the Receiver over the assets of the following:

(1) Beckman's estate; (2) the OPCG; (3) every other corporation or entity under the

control of Defendants and Relief Defendant Hollie Beckman; and (4) any assets held by

or for the benefit of Hollie Beckman which were received from Defendants, or acquired

with funds received from Defendants.  Order of 3/8/11, Beckman SEC, 11-CV-574, ECF

No. 10.  As with the Cook Receivership, the Receiver was granted the authority to

manage, control, and preserve the assets of the Receiver Estates.  Id. at 2-3.  The Court

also granted the SEC's motion to freeze Defendants' assets.  Id.

In March 2011, upon the Receiver's motion, the Court ordered the Beckmans to

vacate their home in Plymouth, Minnesota, permitting them to take items such as

clothing, toiletries, non-valuable items of emotional importance, and their children's

personal property.  Order of 4/1/11, Beckman SEC, 11-CV-574, ECF No. 37.

Subsequently, the Receiver moved for the sale of certain personal property in the

Plymouth home in order to prepare it for sale and to also defray expenses incurred in

maintaining the Beckmans' real estate holdings.  Pl.'s Mem. Supp. Mot. for Sale at 10-

11, Beckman SEC, 11-CV-574, ECF No. 103.  The personal property in the Plymouth

home included several flat-screen televisions, leather furniture, appliances, a billiard

table, a poker table, and a hot tub.  Id. at 4-5.   Mr. Beckman attended the hearing on this

motion, and the Court subsequently granted the Receiver's motion.  Minute Entry of

6/17/11, Beckman SEC, 11-CV-574, ECF No. 123; Order of 6/23/11, ECF No. 124.

The Receiver also sought permission to sell the Beckmans' two properties in Texas

– a larger home located at 2400 Paseo del Lago, Mission, Texas, known as "the Big

House," and a smaller home located at 7432 Golf Drive, Mission, Texas, known as "the

Little House" – which this Court granted.  Order of 6/23/11, Beckman SEC, 11-CV-574,

ECF No. 125.  After the houses were sold, the Receiver moved to confirm the respective

sales.  Pl.'s Mot. to Confirm Sale, Beckman SEC, 11-CV-574, ECF Nos. 161 & 174.

Beckman did not oppose the Receiver's motion to confirm the sale of the Big House,

although he objected to the extent that the Receiver sought to sell certain personal

property and property belonging to third parties that was housed there.  Def.'s Resp. to

Mot. to Confirm Sale at 1-3, Beckman SEC, 11-CV-574, ECF No. 192.  As to the Little

House, Beckman filed a Motion to Intervene on behalf of his in-laws, Robert and Dianne

Birk.  Def.'s Mot. to Intervene, Beckman SEC, 11-CV-574, ECF No. 195.  In the motion,

Beckman/the Birks objected to the sales price of the Little House and asserted that the

Birks had invested a considerable amount of their own funds to improve the Little House.

Id. at 3.  In response, the Receiver noted that any objections were untimely, as the Court

had already authorized the sales of the Texas properties.  Pl.'s Resp. at 2-3, Beckman

SEC, 11-CV-574, ECF No. 204.  The Receiver further argued that because he stood in

Beckman's shoes, Beckman lacked standing to oppose the Receiver's motion, and the

Birks lacked standing to intervene.  Id.  After a hearing on the motions – attended by the

8

Beckmans – the Court confirmed the sale of both of the Texas properties.  Minute Entry

of 9/16/11, Beckman SEC, 11-CV-574, ECF No. 208, Orders of 9/16/11, Beckman SEC,

11-CV-574, ECF Nos. 209 & 210.

The Court also denied the Birks' Motion to Intervene, finding that they had no

cognizable ownership interest in the property and had presented no evidence of an

agreement with the Beckmans regarding any improvements made to the property.  Order

of 9/21/11, Beckman SEC, 11-CV-574, ECF No. 214.  In addition, the Court noted that

even if the Birks had presented such an agreement, it would have related to value added

to the property.  Id.  However, since the Beckmans purchased the property for $167,000

and sold if for $112,500, the Court found that "no value was actually added to the

property."  Id.  Moreover, the Court also noted that the Birks lived in the house rent-free,

therefore, "any equitable claim they may have would have to be offset by the rent

Beckman failed to collect."   Id. at 2.

### B.     Defendants in the Instant Litigation

As noted, in this litigation, the Receiver seeks the return of certain distributions

made to Defendants.

### 1.     Adel Hilal

Defendant Adel Hilal invested $49,000 in Cook's Ponzi scheme, and, in return,

received a single transfer totaling $56,201.14.  (Hilal Investment Docs., Exs. 2-4 to

Kaczrowski Decl. [Doc. Nos. 142-2 to 142-4].)  The Receiver seeks the return of

$7,201.14 from Hilal.  (Pl.'s Mem. Supp. Mot. for Summ. J. at 13 [Doc. No. 141].)

### 2.     Mark Stoltenberg

Defendant Mark Stoltenberg received a transfer of $3,500 from UBS.  (Stoltenberg Transfer, Ex. 1 to Kaczrowski Dec. [Doc. No. 142-1].)  No records demonstrate that Stoltenberg made an investment in Cook's foreign currency scheme, although Stoltenberg asserts that he invested $3,500.  (Stoltenberg's Opp'n Mem. at 6 [Doc. No. 158].)   The Receiver seeks to recoup $3,500 from Stoltenberg. (Pl.'s Mem. Supp. Mot. for Summ. J. at 13 [Doc. No. 141].)

### 3.     Robert and Dianne Birk

Defendants Robert and Dianne Birk, are the parents of Hollie Beckman.  (See United States v. Beckman Trial Tr. at 130-31, Ex. 7 to Kaczrowski Decl. [Doc. No. 142-7].)  Testifying at her son-in-law's criminal trial, Dianne Beckman explained that Bo and Hollie Beckman approached the Birks with a plan that would allow the Birks to retire in Texas, while also earning income and maintaining health insurance coverage.  Id. at 135. Under this plan, the Birks were to move to Texas to assist Beckman in his business by introducing him to new clients and contacts.  Id. (stating, "We were going to work for Bo's company and help do what we could to bring business in. . . .")   Pursuant to their arrangement, the Birks moved to Texas and, as of September 2008, began receiving paychecks of $2,223 twice a month.  Id.  Dianne Birk understood that she and her husband were paid by Beckman, through Oxford Global Advisors.  Id. at 143.  At roughly the same time, the Birks also began investing in the Ponzi scheme.  Id. at 146.

The Beckmans purchased the Little House prior to the Birks' move to Texas.  Id.

at 141, 147.  Although the Birks lived in the Little House rent-free, they assert that they

expended approximately $35,000 in renovations to the home.  <u>Id.</u> at 141.  Dianne Birk

expected to recoup the expenditures when the house was sold.  <u>Id.</u> at 148.  As part of their

arrangement with Beckman, the Birks also received health insurance coverage of

$1,258.97 per month from June or July 2008 through August 2009.

On several occasions, the Birks used the Big House, owned by the Beckmans, to

entertain prospective investors.  <u>Id.</u> at 140, 151, 163.  The Birks oversaw several property

improvements to the Big House, including the addition of a tennis court, shuffleboard,

and gazebo.  <u>Id.</u> at 153.   Although the Beckmans and Birks planned to use the Big House

for Beckman's investment seminars, they did not "get to that point."  <u>Id.</u> at 151.   Instead,

the Birks golfed multiple times during the week with Beckman's potential clients.  <u>Id.</u> at

140, 151, 163.

Mrs. Birk stipulated at Beckman's trial to the following: (1) she and her husband

received $286,305.04 from Beckman or his related entities; (2) they invested

$186,779.36; and (3) they received $99,525.68 more than they invested.  <u>Id.</u> at 160.  Here,

the Receiver offers evidence of slightly higher figures, showing the following: (1) the

Birks received transfers totaling $300,459.65; (2) the Birks invested $187,779.36 in the

scheme; and (3) at least $101,997.94 of the amount received from the scheme was in the

form of "gifts."  (<u>See</u> Birk Bank Records; Birk Received Transfers; Beckman Bank

Records; Birk Bank Records, Birk Investments, Exs. 9-12 to Kaczrowski Decl. [Doc.

Nos. 142-9 -142-12].)   The Receiver seeks to recover $112,680.29 from the Birks. (Pl.'s

Mem. Supp. Mot. for Summ. J. at 13 [Doc. No. 141].)

### C.   Plaintiff's Motion

In Plaintiff's Motion for Summary Judgment, the Receiver argues that no material

issues of fact exist as to his fraudulent transfer claim against the remaining Defendants.

(Id. at 14.)  Specifically, the Receiver contends that "the Ponzi scheme presumption"

applies and that Defendants cannot demonstrate that the "good faith" and "reasonably

equivalent value" affirmative defenses apply.  (Id. at 14-21.)  Similarly, the Receiver

asserts that he is entitled to summary judgment on his unjust enrichment claim, arguing

that Defendants knowingly received something of value to which they were not entitled,

and that it would be unjust for Defendants to retain it.  (Id. at 23-26.)  Finally, the

Receiver contends that Defendants' remaining defenses (e.g., failure to plead fraud with

specificity, no evidence of wrongdoing, laches, accord and satisfaction, and payment) fail

as a matter of law.  (Id. at 26-30.)

In a two-page response, Hilal asserts that genuine issues of material fact preclude

summary judgment.  (Hilal's Opp'n Mem. at 1 [Doc. No. 156].)   Hilal submits a

declaration in support of his argument, detailing how Beckman solicited him to invest

$50,000 in Cook's foreign currency scheme.  (See Hilal Decl. ¶¶ 5-14 [Doc. No. 156].)  It

was Hilal's understanding that his $50,000 was invested in British bonds for a two-year

period.  (Id. ¶¶ 8-12.)  After the two-year period, Hilal asked Beckman to sell the bonds.

(Id. ¶ 13.)  Hilal then received a transfer of $56,734.98, which he believed was the return

on his initial $50,000 investment.  (Id.; Hilal Financial Statement, Ex. 3 to Hilal Decl. [Doc. No. 156-1].)

In response to the Receiver's summary judgment motion, Stoltenberg contends that Arizona's statute of limitations applies to Plaintiff's fraudulent transfer claim and that the claim is time-barred.  (Stoltenberg's Opp'n Mem. at 2-3 [Doc. No. 158].)  In addition, Stoltenberg asserts that he did, in fact, invest money in the Ponzi scheme, in response to the Receiver's contention that Stoltenberg made no investment, yet received a return of $3,500.  (Id. at 3-5.)  Stoltenberg argues that the Receiver asserts no plausible claim for relief against him.  (Id. at 5.)  He further contends that there are material facts in dispute, precluding summary judgment.  (Id. at 6.)

The Birks also oppose the Receiver's summary judgment motion.  However, they are willing to stipulate to judgment in the amount of $23,302.85 (Birks' Opp'n Mem. at 1 [Doc. No. 148]), as opposed to the $112,680.29 judgment sought by the Receiver.  (Pl.'s Mem. Supp. Mot. for Summ. J. at 13 [Doc. No. 141].)  They contend that distributions received in the following categories were taken in good faith and for reasonably equivalent value: (1) reimbursement of expenses made by the Beckmans to the Birks; (2) money that the Birks spent to improve the Little House; and (3) personal property belonging to the Birks that was in Beckman's possession at the initiation of the receivership, and which the Receiver subsequently sold.[4]  (Birks' Opp'n Mem. at 2 [Doc.

---

[4]  The Birks assert that the following items of their personal property were stored in the Beckmans' Plymouth home, and were subsequently sold by the Receiver:  a small

No. 148].)  They estimate a total personal property value of $15,000.  (Birks' Aff. ¶ 5

[Doc. No. 147].)   As to their claim of reimbursed expenses, the Birks attest that the

Beckmans or Oxford Entities reimbursed them for expenses incurred in connection with

work performed at the Big House.  (Id. ¶ 3.)

## II.    DISCUSSION

### A.    Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the

moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The Court

must view the evidence and the inferences that may be reasonably drawn from the

evidence in the light most favorable to the nonmoving party.  Enter. Bank v. Magna

Bank, 92 F.3d 743, 747 (8th Cir. 1996).  However, "summary judgment procedure is

properly regarded not as a disfavored procedural shortcut, but rather as an integral part of

the Federal Rules as a whole, which are designed to secure the just, speedy, and

inexpensive determination of every action."  Celotex Corp. v. Catrett, 477 U.S. 317, 327

(1986).

---

safe, an antique clawfoot table with marble insert, and antique long-stem silver goblets.
(Birks' Aff. ¶ 5 [Doc. No. 147].)  With respect to personal property in Texas, the Birks
contend that they owned the following items, used in the Big House, and which the
Receiver subsequently sold:  two bedroom sets, a love seat, matching ottoman and two
chairs, two lamps, numerous wall hangings, an antique silver tea set and silver serving
pieces, antique Majolica plates, numerous religious articles of sentimental value, their
grandson's rocking chair and rocking airplane, dishes, pots, pans, crystal bowls,
appliances, and Christmas decorations.  (Id.)

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. <u>Id.</u> at 323; <u>Enter. Bank</u>, 92 F.3d at 747. A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials, but must set forth specific facts in the record showing that there is a genuine issue for trial. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986). On a motion for summary judgment, the Court views the facts in the light most favorable to the nonmoving party. <u>Davison v. City of Minneapolis</u>, 490 F.3d 648, 651 (8th Cir. 2007).

Stoltenberg, who appears pro se, captioned his response to the Receiver's summary judgment motion as a "Motion to Dismiss and Opposition to Summary Judgment F.R. Civ. P. 12(b)(6)" [Doc. No. 157]. The Court construes Stoltenberg's filing as a memorandum in opposition to summary judgment, and not as a motion to dismiss. Stoltenberg filed the document long after he had filed an answer in October 2013. Motions to dismiss under Rule 12(b)(6) must be made before the filing of a responsive pleading such as an answer. Fed. R. Civ. P. 12(b)(6). In addition, the standard of review applicable to Stoltenberg – the non-moving party in a summary judgment motion – is actually more favorable to him than if he were the moving party in a motion to dismiss. <u>Cf.</u> <u>Enter. Bank</u>, 92 F.3d at 747 (requiring on summary judgment, that the court view the evidence in the light most favorable to the nonmoving party), <u>with</u> <u>Morton v. Becker</u>, 793 F.2d 185, 187 (8th Cir. 1986) (on a motion to dismiss for failure to state a claim, the court

must assume the facts in the complaint to be true and construe all reasonable inferences from those facts in the light most favorable to the plaintiff).[5]

## B.    Fraudulent Transfer

Minnesota has adopted the Uniform Fraudulent Transfer Act, Minn. Stat. § 513.43, *et seq.* (the "MUFTA").  A cause of action for fraudulent transfer under the MUFTA may arise if the transfer was made either "with actual intent to hinder, delay, or defraud any creditor of the debtor," or "without receiving a reasonably equivalent value in exchange for the transfer or obligation."  Minn. Stat. § 513.44(a)(1)-(2).[6]  Here, Plaintiff pleads a fraudulent transfer claim involving actual fraudulent intent.  (See Compl. ¶ 125 [Doc. No. 1].)  Because proof of such actual intent "may rarely be established by direct evidence,

---

[5] However, the Court notes that if it construed Stoltenberg's motion as a motion to dismiss, under the applicable standard of review, the Receiver's Complaint meets the standard, as it contains "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 545 (2007).

[6] Along with many other federal district courts, this Court has found that fraudulent transfer claims brought under federal bankruptcy statutes, in particular, 11 U.S.C. § 548, provide a useful analogy to Uniform Fraudulent Transfer Act ("UFTA") claims.  See S.E.C. v. Brown, 643 F. Supp. 2d 1077, 1082, n.3 (D. Minn. 2009).  Similar to language in the MUFTA statute, § 548 states that a "trustee may avoid any transfer . . . of an interest of the debtor in property . . . if the debtor voluntarily or involuntarily . . . made such transfer . . . with actual intent to hinder, delay, or defraud any entity to which the debtor was or became . . . indebted." 11 U.S.C. § 548(a)(1)(A).  As the MUFTA and § 548 are similar, the Court relies on decisions arising under § 548 in addressing Plaintiff's fraudulent transfer claim.  Likewise, because most states' UFTA laws are identical, this Court considers decisions from other jurisdictions in interpreting the MUFTA. See Armstrong v. Collins, No. 01 Civ. 2437 (PAC), 2010 WL 1141158, at *18 (S.D.N.Y. Mar. 24, 2010) (considering decisions from other jurisdictions, as relevant portions of other states' UFTA statutes were substantively the same).

courts infer fraudulent intent from the circumstances surrounding the transfer." Brown v. Third National Bank (In re Sherman), 67 F.3d 1348, 1353-54 (8th Cir. 1995). A common method of inferring actual fraudulent intent requires the court to consider whether the transfer in question bears the indicia of fraud, or "badges of fraud." Id.

A number of courts have approved another method of inferring fraudulent intent in cases involving Ponzi schemes. See Wagner v. Pruett (In re Vaughan Co., Realtors), 477 B.R. 206, 218 (Bankr. D. N.M. 2012) (collecting cases). Applying the "Ponzi scheme presumption" to cases in which the transfer is made pursuant to a Ponzi scheme, courts have found that the existence of the scheme satisfies the requirement of "actual intent." Id. Courts applying this presumption have explained that actual intent is satisfied because "transfers made in the course of a Ponzi scheme could have been made for no other purpose other than to hinder, delay or defraud creditors." In re Manhattan Inv. Fund Ltd., 359 B.R. 510, 517-18 (Bankr. S.D.N.Y. 2007), rev'd in part, 397 B.R. 1 (S.D.N.Y. 2007). The Eighth Circuit has not yet ruled on the application of the Ponzi scheme presumption to alleged fraudulent transfers under the UFTA, parallel state statutes, or the federal bankruptcy statutes, although at least five other federal circuits – the Fifth, Sixth, Ninth, Tenth, and Eleventh Circuits – have adopted or applied the Ponzi scheme presumption. See, e.g., Wing v. Dockstader, 482 Fed. App'x 361, 363 (10th Cir. 2012) (unpublished); Perkins v. Haines, 661 F.3d 623, 626-27 (11th Cir. 2011); Donell, 533 F.3d at 770-71; Warfield, 436 F.3d at 558-59; In re Mark Benskin & Co., 59 F.3d 170, 1995 WL 381741, at *5 (6th Cir. 1995) (unpublished table decision) (per curiam). If the Ponzi scheme

presumption applies to the transfers at issue, a court need not examine the badges of

fraud.  See Wiand v. Lee, 753 F.3d 1194, 1201 (11th Cir. 2014).

    The Receiver asserts a fraudulent transfer claim in this case solely under

Minnesota state law.  (Compl. ¶¶ 122-27 [Doc. No. 1].)   Quite recently, while the instant

motions were pending before the Court, the Minnesota Supreme Court ruled that the

Ponzi scheme presumption does not apply to claims brought under the MUFTA.  Finn v.

Alliance Bank, __ N.W.2d __, 2015 WL 672406, at *13-14 (Minn. Feb. 18, 2015).

Focusing on the MUFTA's language, the Minnesota Supreme Court found that the

"MUFTA does not contain a provision allowing a court to presume anything based on the

mere existence of a Ponzi scheme."  Id. at *7.   Further, the court concluded that even if

evidence supported an inference that Ponzi scheme operators generally intended to

defraud investors, the statutory language of the MUFTA did not permit a court to

presume fraudulent intent.  Id. at *8.   Further, the court rejected the public policy

argument applied by other courts, and grounded in equity, that the Ponzi scheme

presumption serves the purpose of fraudulent transfer laws by attempting to ratably

distribute assets among all participants, including investors who lost everything.  Id. at

*13. (citations omitted).  Rather, the Minnesota Supreme Court noted that "equality

among a debtor's creditors, even if they are victims of a Ponzi scheme, is *not* the purpose

of the MUFTA."  Id. (emphasis in original).

    The Minnesota Supreme Court's ruling in Finn forecloses the relief sought by

Plaintiff based on application of the Ponzi scheme presumption.  However, as noted,

actual fraud may also be established with reference to a "badges of fraud" analysis.  In re

Sherman, 67 F.3d at 1353-54.  Because the parties lacked the guidance of the recent Finn

decision at the time of dispositive motion briefing, the Court denies Plaintiff's motion for

summary judgment without prejudice.  Although the dispositive motion deadline has

since passed, in light of Finn, the Court will permit the parties to submit amended

dispositive motions within 30 days.

### B.    Unjust Enrichment

Plaintiff also seeks the return of Defendants' distributions under the alternative

theory of unjust enrichment, arguing that Defendants' retention of the funds at the

expense of other defrauded investors violates fundamental principles of equity.  (Compl

¶¶ 128-32 [Doc. No. 1].)  While Federal Rule of Civil Procedure 8(d) permits a party to

plead in the alternative, asserting both legal claims and equitable claims for unjust

enrichment in many circumstances, see Daigle v. Ford Motor Co., 713 F. Supp. 2d 822,

828 (D. Minn. 2010) (permitting simultaneous pleading of breach of warranty claim and

unjust enrichment claim on a motion to dismiss), ultimately, under Minnesota law, "'[a]

party may not have equitable relief where there is an adequate remedy at law available.'"

In re Levaquin Prods. Liab. Litig., 752 F. Supp. 2d 1071, 1081 (D. Minn. 2010) (quoting

ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc., 544 N.W.2d 302, 305 (Minn.

1996)).  Should Plaintiff choose to file an amended summary judgment motion and

establish that he is entitled to summary judgment on his fraudulent transfer claim, a ruling

on that statutory claim would foreclose relief on the equitable remedy of unjust

enrichment.  Accordingly, the Court denies without prejudice Plaintiff's motion for summary judgment as to the claim for unjust enrichment.  Plaintiff may reassert this basis for relief in an amended dispositive motion if he so chooses; Defendants may similarly move for summary judgment on this claim in an amended summary judgment motion, or oppose Plaintiff's amended motion, if one is brought.

### C.    Certain Defenses

Primarily in their Answers, Defendants have asserted various affirmative defenses. Also, as noted earlier, the Court construes Stoltenberg's Motion to Dismiss and Opposition to Summary Judgment [Doc. No. 157] as a memorandum in opposition to the Receiver's summary judgment motion.  Because the Court is permitting the parties to file amended summary judgment motions in light of Finn, the Court defers ruling on any defenses, and the parties may reassert their defenses in any amended filings.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

1.    Plaintiff's Motion for Summary Judgment [Doc. No. 139] is **DENIED WITHOUT PREJUDICE**;

2.    Defendant Stoltenberg's Motion to Dismiss and Opposition to Summary Judgment [Doc. No. 157] is **DENIED WITHOUT PREJUDICE**; and

3.    In light of recent changes in the applicable law during the pendency of these motions, the parties are permitted to submit amended summary judgment motions within the next 30 days.

Dated:    March 10, 2015

                                        s/Susan Richard Nelson
                                        SUSAN RICHARD NELSON
                                        United States District Court Judge